

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

December 23, 2020

**BY ECF and EMAIL**

The Honorable Laura Taylor Swain
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

  Re: *United States v. Harold Hill*, 16 Cr. 397 (LTS)

Dear Judge Swain:

  The Government respectfully submits this letter in response to defendant Harold Hill's renewed motion for release pursuant to 18 U.S.C. § 3582(c)(1)(A). On April 6, 2020, Hill filed a motion seeking release. (Dkt. No. 374). The Court denied Hill's motion without prejudice to renewal once he exhausted his administrative remedies. (Dkt. No. 381). On May 6, 2020, Hill filed a renewed motion for release (Dkt. No. 382), which the Court denied on May 26, 2020 (Dkt. No. 388). On December 13, 2020, Hill again renewed his motion for release. (Dkt. No. 410). As discussed below, the instant motion should be denied because the factors outlined in 18 U.S.C. § 3553(a) weigh heavily against early release.

**I. Background**

  **A. Hill's Indictment and Guilty Plea**

  On June 8, 2016, a grand jury sitting in this District returned Indictment 16 Cr. 397 (LTS) (the "Indictment"), charging the defendant and nine others with a crack distribution conspiracy.[1] (Dkt. No. 1). The defendant was charged in Count One with conspiring to distribute, and possess with the intent to distribute, 280 grams and more of crack cocaine, in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(A). (*Id.*) The defendant was arrested on the charges in the Indictment on or about September 9, 2016, and ordered detained. (Dkt. No. 65). On August 7, 2017, the defendant pleaded guilty to the lesser-included offense of conspiring to distribute, and possess with the intent to distribute, 28 grams and more of mixtures and substances containing a

---

[1] On the same date, a grand jury sitting in this District returned Indictment 16 Cr. 396 (GHW), in which an additional twenty-two defendants were charged with related narcotics and firearms offenses before the Honorable Gregory H. Woods in 16 Cr. 396 (GHW).

detectable amount of cocaine base, in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(B).

### B. Hill's Distribution of Crack in the Lincoln Houses

In or about January 2015, the New York City Police Department (the "NYPD") and the Bureau of Alcohol, Tobacco, Firearms and Explosives (the "ATF") began investigating drug-trafficking and related firearms offenses, going back to as early as 2008, in the area of the Lincoln Houses. (PSR ¶ 8-9).[2] Through the investigation, law enforcement identified two related drug-trafficking crews in the Lincoln Houses: one dominating the East Side of the Lincoln Houses (the "East Side Crew") and one dominating the West Side of the Lincoln Houses (the "West Side Crew"). (*Id.* ¶ 10).

The East and West Side crews operated a 24/7 crack-sale operation in the Lincoln Houses. (*Id.*). Over the course of approximately 18 months, the NYPD engaged in more than 200 controlled purchases of crack across the East and the West Sides. (*Id.*). Notably, in that time period, an undercover officer ("UC") was never turned away for lack of supply—if a dealer ran out of crack, he would pool his supply with his co-conspirators. (*Id.*). It was a round-the-clock operation. (*Id.*).

While these two crews generally distributed crack on their respective sides, there were members of each crew that were permitted to cross over and sell on each side of the Lincoln Houses. (*Id.* ¶ 11). Moreover, members of each crew protected each other's right to sell exclusively in Lincoln. (*Id.*). Outsiders were not allowed. (*Id.*).

In particular, on the West Side, this protection was done through violence and use of firearms. (*Id.* ¶ 12). Firearms were held directly by individuals and were also placed strategically throughout the West Side so that members of the West Side Crew would have easy access. (*Id.*). These firearms were left in places such as garbages, scaffolding, and the grass—communal spaces also shared by children and other residents. (*Id.*). The West Side Crew further engaged in violent rivalries with neighboring housing development drug crews. (*Id.* ¶ 13). While the East Side crew was generally less violent, it benefitted from the West Side Crew's protection of Lincoln's turf.

Moreover, the East and West Side Crews interfered with the lives of law-abiding residents of the Lincoln Houses on a daily basis. (*Id.* ¶ 14). Most of the crack sales made to the UCs were made in elevators, stairwells, lobbies, and public hallways. (*Id.*). The videos of certain of these sales show the defendants slinging crack while surrounded by children in public spaces at all times of day and night. (*Id.*). Residents of the Lincoln Houses could not enter or exit certain buildings without running into these crack sale operations.

As part of his guilty plea, Hill accepted responsibility for selling between 840 and 2.8 kilograms of crack as part of his participation in this conspiracy. Hill was a founding member of the Lincoln Crew, and not only distributed crack himself, but also provided crack for other members to distribute. Hill also enjoyed protection through the crew's more violent members.

---

[2] "PSR" refers to the Presentence Investigation Report dated October 27, 2017.

During the course of the investigation, the NYPD conducted approximately four undercover purchases of crack from Hill, for a total of approximately 101 twists of crack from Hill and his partners in the sales. (*Id.* ¶ 17). The undercover buys show Hill working in coordination with co-defendants Bernard Walker and Derek Smith. (*Id.*). Had the case proceeded to trial, at least two Government witnesses would have testified that Hill had long sold crack in the Lincoln Houses, and that Hill provided crack to others to sell. Indeed, during one of the undercover purchases of crack on September 14, 2015, Hill stated that others in Lincoln, including co-defendants Antoine Mitchell and Derek Smith, sold Hill's supply. Hill also indicated that much of the crack being sold at the Lincoln Houses was his supply, saying, "All this my shit" and gesturing across the buildings. Moreover a YouTube video documenting the history of the Lincoln Crew highlighted Hill as a "Lincoln Legend" for his years of drug-trafficking in Lincoln. In the video, Hill bragged about all of the money he was making by selling drugs in the Lincoln Houses.

### C. Hill's Sentencing and Motions for Compassionate Release

On February 1, 2018, the Court sentenced the defendant to 84 months' imprisonment, to be followed by five years' supervised release. (Dkt. No. 307). While Hill's sentence will run until August 26, 2021, he is expected to be transferred to a Residential Reentry Center ("RRC") in March 2021.

On March 30, 2020, the defendant, through his counsel, applied to the Warden of FCI Terry Haute for compassionate release pursuant to 18 U.S.C. § 3582. (Dkt. No. 374, Ex. A). On April 6, 2020, the Warden denied the defendant's application. (*Id.*) On April 6, 2020, the defendant filed a motion with this Court seeking release. (Dkt. No. 374). The Court denied the defendant's motion for failure to exhaust his administrative remedies without prejudice to renewing the motion. (Dkt. No. 381). On May 6, 2020, the defendant filed a second motion for compassionate release. (Dkt. No. 382). The Government opposed the defendant's motion, arguing that (i) the spread of COVID-19 and the defendant's medical conditions of asthma and chronic obstructive pulmonary disease ("COPD") did not qualify as extraordinary and compelling circumstances; (ii) the defendant remains a danger to the community; and (iii) a sentence reduction was not warranted in light of the 3553(a) factors. (Dkt. No. 384). The Court denied the defendant's motion, holding that (i) Hill had not demonstrated extraordinary and compelling circumstances, particularly given the absence of COVID-19 cases at his prison facility and (ii) Hill continued to be a danger to the community. (Dkt. No. 388).

### II. Applicable Law

Under 18 U.S.C. § 3582(c), a district court "may not" modify a term of imprisonment once imposed, except under limited circumstances. One such circumstance is the so-called compassionate release provision, which provides that a district court "may reduce the term of imprisonment" where it finds "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i). A motion under this provision may be made by either the Bureau of Prisons ("BOP") or a defendant, but in the latter case only "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.* (emphasis added). Once a defendant has

exhausted his administrative remedies, the Court may then consider a motion for compassionate release. As relevant here:

> [T]he court, . . . upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment . . . after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

18 U.S.C. § 3582(c)(1)(A).

The relevant Sentencing Commission policy statement is found in U.S.S.G. § 1B1.13. It provides that the Court may reduce the term of imprisonment if "extraordinary and compelling reasons warrant the reduction," *id.* § 1B1.13(1)(A); "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)," *id.* § 1B1.13(2); and "the reduction is consistent with this policy statement," *id.* § 1B1.13(3). *See Dillon v. United States*, 560 U.S. 817, 827 (2010); 28 U.S.C. § 994(t) (delegating authority to U.S. Sentencing Commission to define "extraordinary and compelling reason").

The Application Notes describe specific circumstances under which "extraordinary and compelling reasons exist." U.S.S.G. § 1B1.13, app. n.1. The first relates to the defendant's own medical condition and requires that the defendant be: (1) suffering from a serious physical or medical condition; (2) suffering from a serious functional or cognitive impairment; or (3) experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover. U.S.S.G. § 1B1.13, app. n.1. The second applies when a defendant is at least 65 years old, is seriously physically or mentally deteriorating, and has served a prescribed amount of prison time. *Id.*, app. n.1(B). The third applies when the caretaker of a defendant's minor child(ren) dies or becomes incapacitated, or the defendant's spouse or registered partner becomes incapacitated and the defendant would be the only available caregiver for the spouse or registered partner. *Id.*, app. n.1(C). The fourth, entitled "Other Reasons," provides that compassionate release can be justified if "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." *Id.*, app. n.1(D).

Although the Guidelines policy statement is no longer a binding limitation on a district court's authority to grant compassionate release after passage of the First Step Act, *see United States v. Brooker (Zullo)*, No. 19-3218-cr (2d Cir. Sep. 25, 2020), it remains a relevant and helpful consideration as a data-point for the types of circumstances that the Sentencing Commission believes constitute "extraordinary and compelling reasons."

"[T]he existence *vel non* of 'extraordinary and compelling reasons' determines only whether a defendant can be considered for release—the existence of such reasons does not mandate release." *United States v. Ebbers*, No. S4 02 Cr. 1144-3 (VEC), 2020 WL 91399, at *6 (S.D.N.Y. Jan. 8, 2020); *see also United States v. Israel*, No. 05 Cr. 1039 (CM), 2019 WL 6702522, at *11 (S.D.N.Y. Dec. 9, 2019) ("A court is not required to reduce a sentence on compassionate release grounds, even if a prisoner qualifies for such reduction because of his medical condition. . . . [Section 3582] was drafted using the word 'may,' not 'must.'").

If a court finds that a defendant qualifies for consideration for release, it must then consider the Section 3553(a) factors. Those factors include, among others: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense . . . [and] to afford adequate deterrence to criminal conduct"; (3) the need "to provide the defendant with needed . . . medical care"; and (4) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a).

The defendant bears the burden of showing that he is entitled to a sentence reduction or modification. *See, e.g.*, *United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("A party with an affirmative goal and presumptive access to proof on a given issue normally has the burden of proof as to that issue."); *cf. United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013) ("[A] defendant, as the § 3582(c)(2) movant, bears the burden of establishing that a retroactive amendment has actually lowered his guidelines range in his case.").

"[C]ompassionate release motions amid the COVID-19 pandemic have required a 'fact-intensive' inquiry, made in the 'unique circumstances' and 'context' of each individual defendant." *United States v. Hamed*, No. 17 Cr. 302 (KPF), 2020 WL 3268657, at *3 (S.D.N.Y. June 17, 2020) (quoting *United States v. Brady*, No. 18 Cr. 316 (PAC), 2020 WL 2512100, at *3 (S.D.N.Y. May 15, 2020)). In evaluating compassionate release motions based on COVID-19, courts in this District have considered "the age of the prisoner, the severity and documented history of the defendant's health conditions, as well as the defendant's history of managing those conditions in prison; the proliferation and status of infections in the prison facility; the proportion of the term of incarceration that has been served by the prisoner; and the sentencing factors in 18 U.S.C. § 3553(a), with particular emphasis on the seriousness of the offense, the deterrent effect of the punishment, and the need to protect the public." *Id.*

### III. Discussion

First, the Government does not contest that the defendant has met the threshold requirements for seeking compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). As discussed above, the defendant has exhausted his administrative remedies. Moreover, since the time of the defendant's last motion for release, the Centers for Disease Control and Prevention ("CDC") have amended their guidance with regard to COPD, which is now classified as a condition that places individuals at increased risk of severe illness should they contract COVID-19. *See* CDC, People with Certain Medical Conditions, *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html. Given the change in the CDC's position,

the Government no longer contests that the defendant has demonstrated extraordinary and compelling circumstances.[3]

Nevertheless, the Court should deny the defendant's motion because the factors set forth in 18 U.S.C. § 3553(a) do not support a sentence modification. The Section 3553(a) factors—that is, the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence to criminal conduct, and protect the public from further crimes of the defendant—counsel against early release of the defendant.

First, the defendant committed an incredibly serious offense involving the sale of a deadly narcotic that terrorized an entire community within the Lincoln Houses. And the defendant's participation in the conspiracy was significant. As part of his guilty plea, the defendant accepted responsibility for selling between 840 grams and 2.8 kilograms of crack. During the course of the investigation, Hill was recorded on video selling crack to an undercover officer four times, for a total of 101 twists of crack. Those videos showed Hill working in coordination with other members of the conspiracy and proudly proclaiming that others in Lincoln were selling crack for him (saying, "All this my shit" and gesturing across the buildings). A YouTube video also proclaims the defendant as a legend of the Lincoln Houses and shows the defendant bragging about all of the money he was making in Lincoln.

The defendant and his co-conspirators' round-the-clock crack-sale operation in a residential housing development had severe consequences for the community. (Tr. at 33 ("Mr. Hill committed a very serious crime over a very long period of time. I hear and understand that the Lincoln Houses is a multifaceted community, but one very dangerous facet of that community was a round-the-clock drug-trafficking conspiracy.")). Because of the drug crews operating on the East and West Sides, the Lincoln Houses were overrun with crack sales and violence. Residents in the Lincoln Houses could not walk through their hallways, use their elevators, or access communal areas without being confronted by crack dealers and users. The defendant and other members of the conspiracy exposed innocent residents of the Lincoln Houses to dangerous conditions, including rivalries and turf wars with drug-dealing crews from neighboring housing developments. As this Court found at sentencing, the defendant's drug-trafficking "impeded and threatened the lives of people who were trying to bring their families up in a different way, who were trying to make a home in the Lincoln Houses that was apart from that culture and apart from dangerous temptations and dangers to their children that are associated with that culture." (Tr. at 33).

Second, the defendant's history presents a high likelihood of recidivism. As set forth in the PSR, the defendant's prior criminal conduct demonstrates a sustained disregard for the law, including (i) bail jumping in the first degree in March 2011, for which he was sentenced to two to four years' imprisonment; (ii) possession of marijuana with intent to distribute in September 2010, for which he was sentenced to ten years' imprisonment with eight years and eight months

---

[3] While the Government does not contest that the defendant has demonstrated extraordinary and compelling circumstances, it attaches the defendant's updated 2020 medical records and BOP profile for the Court's reference. These materials are respectfully submitted under seal.

suspended; (iii) criminal sale of a controlled substance in the third degree in July 2009, for which he was sentenced to four years' imprisonment; (iv) criminal possession of a controlled substance in the fifth degree in December 2002, for which he was sentenced to 24 months' to 5 years' imprisonment; (v) two attempted criminal sale of a controlled substance in the fifth degree convictions in May 1996, for which he was sentenced to 18 months' to 3 years' imprisonment; and (vi) attempted criminal possession of a controlled substance in the third degree in March 1994, for which he was sentenced to five years' probation. Despite serving substantial periods of incarceration on prior narcotics convictions, the defendant again and again returned to his illicit drug business and frequently failed to abide by the terms of his parole after release. As this Court held in denying the defendant's prior motion for release, "Mr. Hill's lengthy prior criminal history, which includes a bail jumping offense and five narcotics-related felony offenses, and the fact that he was involved in the narcotics conspiracy when he was over forty years of age, suggests a high likelihood of recidivism." (Dkt. No. 388).

Finally, the defendant is wrong that the BOP's determination that the defendant is eligible for transfer to an RRC in March 2021 warrants immediate release to his mother's home in North Carolina. As this Court found in its prior order denying the defendant's application for release, the defendant's criminal history and offense conduct indicate "a significant risk to the public especially during the current pandemic, when the ability to effectively supervise Mr. Hill is greatly compromised and public law enforcement resources are strained." (Dkt. No. 388). The Court's holding remains true and is not undermined by the defendant's eligibility to serve the remainder of his sentence at an RRC. At an RRC, the defendant will be closely supervised and will live in a "structured, supervised environment," where he will also have access to "employment counseling, job placement, financial management assistance, and other programs and services." BOP, Completing the Transition, *available at* https://www.bop.gov/about/facilities/residential_reentry_management_centers.jsp. Moreover, according to published BOP policy, in selecting inmates for early release, the BOP does not take into account all of the 3553(a) factors and is instead guided in large part by the inmate's completion of RDAP and whether the inmate was convicted of a violent offense. *See* BOP, Early Release Procedures, *available at* https://www.bop.gov/policy/progstat/5331.02cn.pdf. Ultimately, the BOP's determination cannot replace this Court's analysis and, in any event, the BOP has only determined that the defendant can be released into a structured and supervised environment, not into his mother's home with limited opportunity for supervision given the restrictions of the pandemic.

## IV. Conclusion

Because the 3553(a) factors here strongly weigh against immediate release of the defendant, his motion should be denied.

Respectfully submitted,

AUDREY STRAUSS
Acting United States Attorney

By: ___/s/___
Amanda L. Houle
Jason M. Swergold
Assistant United States Attorneys
(212) 637-2194/1023

Cc: Susan Walsh, Esq. (by ECF/email)